

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00168-CV

---

IN THE INTEREST OF M.A.M.S.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which Mother and Father appeal the termination of their parental rights to their daughter, M.A.M.S. In one issue each, Mother and Father both argue that the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights to M.A.M.S. was in her best interest. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal was filed).

## II. BACKGROUND

Unaware that she was in labor and believing that she was experiencing bladder pain, Mother gave birth to M.A.M.S. into a toilet on April 12, 2012. Mother did not immediately retrieve M.A.M.S. Instead, Mother was shocked and waited "a minute or so" before removing the newborn child from the toilet. Mother then took M.A.M.S. to the hospital, where both Mother and her newborn tested positive for methamphetamine. A social worker was called to the hospital and questioned Mother about her drug habit, to which Mother replied, "What's there to say[;] I have one." But Mother stated that she only used illegal drugs "socially." Mother acknowledged that she knew that she was pregnant and yet still used methamphetamine. Despite having tested positive for methamphetamine the day M.A.M.S. was born, Mother claimed to have last used methamphetamine two weeks prior to that day.

The hospital could not immediately release M.A.M.S. from care because she was born suffering from methamphetamine withdrawal and required morphine therapy. She was also spitting up blood. At the time of her birth, M.A.M.S. weighed four pounds ten ounces. Father did not come to the hospital, and he refused to return the social worker's calls for six weeks. Hospital officials relayed concern to the Department of Family and Protective Services (DFPS) via Child Protective Services (CPS) that Mother continually complained that someone was going to kidnap M.A.M.S. from the hospital. CPS took possession of M.A.M.S. upon her release and placed her in foster care. After nearly a year

2

of supervised visitations, and group and individual counseling for both Mother and Father, CPS sought termination of their parental rights to M.A.M.S.

At the termination hearing, Sandra Boatner, a case aide for CPS, testified that on several occasions she brought M.A.M.S. from foster care to CPS for monitored visits with Mother and Father. Boatner said that she observed both Mother and Father during these visits. Boatner said that on one occasion in October 2012, after observing Mother and Father arguing in M.A.M.S.'s presence, she requested that Father take a drug test, to which Father "refused and walked out." Boatner averred that on that same occasion Mother was "pretty rough" when handling M.A.M.S.: "She would . . . leave red marks on [M.A.M.S.'s] arms." This concerned Boatner because M.A.M.S. "was pretty small." Boatner also said that despite repeated instruction, Mother often refused to properly support M.A.M.S.'s back and neck and that Mother became agitated by Boatner's instructions.

On one specific visit, Boatner said that Mother, against policy, came to Boatner's vehicle as she was bringing M.A.M.S. in for the supervised visit. Boatner said that she asked Mother to go back to the lobby and wait until she was called. Boatner described how Mother became "very upset" and "started to grab" M.A.M.S. out of Boatner's arms. Boatner testified that Mother screamed and "cussed" at her and that Mother accused Boatner of trying to take her baby. Mother also alleged that Boatner was "getting too attached to her baby." Boatner said that this encounter concerned her because Mother "was very aggressive."

3

Later during that visit, Mother threatened Boatner and told her that she had "better stay away." Disturbed by Mother's behavior, Boatner asked that a supervisor assist in observing the visit. During the visit, Boatner again instructed Mother regarding her improper handling of M.A.M.S. Boatner said that she told Mother that if she did not support M.A.M.S.'s neck and back properly, she would need to end the visit, to which Mother replied that Boatner was "fucking lying" and that Boatner did not have the authority to end the visit. Boatner said that through time, Mother's behavior became more agitated and threatening and that Mother even began to follow Boatner in her vehicle when they would leave visits.

Vickye Key, a licensed chemical dependency counselor (LCDC) for Recovery Resource Council, performed a drug screening and drug referral for Mother in August 2012. Key testified that Mother claimed to have begun using methamphetamine one-and-a-half years prior to the screening. Mother said that she had used methamphetamine "once" seven days prior to the August screening. Mother also said that Father used methamphetamine in their home. Key recommended that Mother attend a substance abuse outpatient program.

Mark Randall DeHart, a LCDC intern, counseled Father from October 31, 2012, through February 16, 2013. According to DeHart, Father has substance abuse issues; specifically, alcohol and methamphetamine abuse, but Father does not agree that he has these issues. Instead, Father believes that any problems that he may have are the result of CPS removing M.A.M.S. from his and Mother's home. DeHart testified that although Father completed the

4

required number of counseling sessions, Father was neither stable nor sober enough to effectively parent.

Charlotte Tucker, a LCDC for Mental Health Mental Retardation (MHMR) of Tarrant County, also counseled Mother for both substance abuse and mental health issues. By Tucker's account, Mother suffers from bipolar disorder and schizophrenia. Mother expressed to Tucker that she hears voices and sees "shadows." Tucker testified that although Mother completed the initial stages of counseling, she became indignant at Tucker's recommendation that she complete a designed course of counseling specifically tailored to Mother. Mother admitted to Tucker that she and Father had used methamphetamine after a February 2013 court hearing. Much like Father, Mother blames any problems that she might have on CPS. Mother does not believe that her methamphetamine use is cause for concern.

Lori Smith, a LCDC and group counselor for MHMR's Community Addiction Treatment Services, testified that she was Mother's group counselor while Mother was participating in CPS's service plan. Smith also testified that Mother admitted that she and Father had used methamphetamine after the February 2013 court date. Smith testified that Mother had multiple relapses of methamphetamine use while under her care. Mother said that CPS was purposely trying to terminate her parental rights to M.A.M.S. and that if "CPS would just give [M.A.M.S.] back" to her, Mother believed that she would stop hearing voices. According to Smith, Mother suffers from "victimization"; believes

5

that she is being persecuted by CPS; and does not make the connection between M.A.M.S.'s removal and her mental and substance abuse issues. In fact, Mother believes that her and Father's methamphetamine use is directly tied to them being despondent over M.A.M.S.'s removal from their home. Smith said that due to Mother's mental health issues, which are exacerbated by methamphetamine use, she would be concerned for M.A.M.S.'s safety if she was returned to Mother. Smith said that because M.A.M.S. was a "drug-exposed child throughout the entire pregnancy" and because Mother suffers from "hallucinations," M.A.M.S.'s return to the home would put her "at risk."

Nichelle Wiggins, a licensed clinical psychologist, performed a CPS-requested psychological evaluation of Mother. During the evaluation, Mother admitted to having used marijuana, cocaine, crank, and methamphetamine in the past. Much like she expressed to Smith, Mother told Wiggins that her current methamphetamine use was directly tied to M.A.M.S.'s removal. And, like Father, Mother has had multiple convictions for DWIs in the past. By Wiggins's account, Mother hears voices and believes that people are conspiring against her. Mother believes that recording equipment has been installed in various places, and she has torn holes in the walls of her home, ransacked her own vehicle, and even torn apart her shoelaces looking for hidden recording and audio equipment. Mother believes that people are out to make her look bad and to separate her from Father.

Mother has stood in the kitchen and in her front yard yelling at the imaginary voices. Wiggins said that Mother believes that if M.A.M.S. is returned to her, she will stop hearing the voices. According to Wiggins, Mother lacks proper coping skills and her only support system is Father. And Mother is constantly accusing Father of having affairs and wanting to leave her. Wiggins expressed that she believed Mother's behavior would be detrimental to M.A.M.S.

Jacqueline Parker, a licensed clinical social worker, also counseled Mother and Father. Mother told Parker about her and M.A.M.S. having tested positive for methamphetamine at the hospital. Parker said that during a June 2012 session, Mother claimed to have not used methamphetamine for a three-week period but then recanted that position after having been confronted with a positive drug-test result. According to Parker, Mother experiences "rapid cycling" of her bipolar disorder, where she will cycle rapidly between depression and mania. Mother expressed to Parker that a specific voice that she hears was that of a person who could see everything that she did and everywhere that she went. This voice says "negative, derogatory comments to her" and also tells her that Father is having an affair. Mother also told Parker about tearing holes in the walls of her home and rifling through her vehicle looking for recording equipment. In her professional opinion, Parker said that Mother is simply not capable of providing a safe and healthy environment for M.A.M.S.

Parker said that Father refused to come to counseling for months. Once there, Father initially denied that he used drugs. But after being confronted with

7

a positive drug-test result, he admitted to having used marijuana and methamphetamine. Parker said that Father even once came to a counseling session exhibiting signs of being under the influence of methamphetamine. Later, Father refused to submit to multiple drug tests. Father expressed to Parker that his and Mother's problems would go away if CPS would return M.A.M.S. Parker also said that Father has "persecution" issues and does not admit his own role in M.A.M.S.'s removal from their home. She also said that Father avoids confrontation "at all costs." Parker said that Father is "not taking responsibility [and is always] blaming others for his problems." Given his scant participation in counseling and his refusal to admit to his substance abuse problems, Parker believes that, like Mother, Father is incapable of providing a safe and healthy environment for M.A.M.S.

CPS caseworker Kurt Pafford conducted a home investigation of the couple's house. Pafford said that the couple had a clean house and that there was nothing specifically wrong with the living conditions of the home, but Pafford expressed concern over the couple's continual argumentative and confrontational relationship and its ill effects upon M.A.M.S. Pafford said that he had observed Mother and Father demonstrate neglect toward M.A.M.S. during supervised visits.

Pafford was also responsible for detailing CPS's service plans to Mother and Father. According to Pafford, when he was explaining her service plan, Mother became confrontational about drug use. Although Mother completed

some steps in her service plan, Pafford said that Mother did not complete a recommended psychological evaluation; failed to attend some individual counseling; and, although she did attend the required number of parenting classes, she failed to demonstrate proper parenting after attending the classes. Pafford said that during the time he supervised Mother's service plan, she failed multiple drugs tests and refused to submit to others. Pafford said that Mother was incapable of providing a proper emotional and physical environment for M.A.M.S.

According to Pafford, Mother does not understand that M.A.M.S. is developmentally delayed. This is so despite Pafford having informed her multiple times. Pafford also said that after a supervised visit with M.A.M.S., when Pafford was returning M.A.M.S. to foster care after the session, Mother followed him in her vehicle. Pafford described that Mother followed him dangerously close, that he feared she might cause her vehicle to collide with his; and that this endangered M.A.M.S., who was riding in the car with him. Pafford described this event: "I was making some pretty obvious turns that didn't make sense in my driving, and she continued to follow me. And that concerned me greatly." Pafford averred that because of Mother's drug use, mental-health issues, her destruction of property related to her hallucinations, and her lack of understanding of M.A.M.S.'s physical needs, he was convinced that termination of parental rights between Mother and M.A.M.S. was in the child's best interest.

9

As to Father, Pafford said that Father did not complete counseling; did not maintain sobriety; and despite also completing the required parenting classes, did not demonstrate proper parenting during supervised visits. Pafford said that like Mother, Father refused multiple drug tests and failed many others. By Pafford's account, Father "fosters a chaotic environment." Pafford testified that he believed that it was in M.A.M.S.'s best interest that Father's parental rights also be terminated.

Pafford testified that M.A.M.S. has progressed since being in foster care, but he also said that M.A.M.S. maintains developmental delays, including lack of some function in her left leg. He said that it is his recommendation that M.A.M.S. be placed with Mother's nephew and wife. They have expressed a desire to adopt M.A.M.S. CPS has conducted a positive home study on the couple, and they are the only relatives that have expressed a desire to raise M.A.M.S. Further, they have purchased a crib, toys, and clothing for M.A.M.S., and they have demonstrated in a supervised environment that they can adequately tend to M.A.M.S.'s special needs related to her developmental delays. Pafford said that unlike Mother and Father, the nephew and his wife have the capacity to make sure that M.A.M.S. can "catch up" developmentally.

After hearing all the evidence, the trial court ordered that both Mother's and Father's parental rights in M.A.M.S. be terminated under Texas Family Code section 161.001(1)(D) and (E). The trial court also found that termination of their parental rights was in M.A.M.S.'s best interest. The trial court further ordered

that Mother's nephew and wife be named M.A.M.S.'s possessory conservators. This appeal followed.

## III. DISCUSSION

In both of their sole issues, Mother and Father contend that the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights is in M.A.M.S.'s best interest. Neither Mother nor Father challenge the trial court's statutory endangerment findings, and we therefore do not address them. *See* Tex. R. App. P. 47.1.

### A. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (*citing Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21. "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional

11

and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (*quoting Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the

13

entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B.    Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

14

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

Here, as to M.A.M.S.'s desires, she was only twelve months old at the time of the termination hearing, and thus her desires are unknown.  As to the emotional and physical dangers to and needs of M.A.M.S. now and in the future, multiple CPS representatives, counselors, and caseworkers testified that due to both parents' continuing methamphetamine use, their failure to recognize the hazard to M.A.M.S. because of their drug use, the hostile environment created by their constant arguing, their lack of recognition of M.A.M.S.'s special needs from her developmental delays, both parents' persecution complexes, and Mother's auditory hallucinations, allowing M.A.M.S. to live with Mother and Father would be detrimental and dangerous to her emotional and physical needs now and in the future.

As to Mother's and Father's parental abilities, multiple witnesses testified that despite Mother and Father having attended parenting classes, neither

15

demonstrated proper parenting skills during supervised visitations, mother physically mishandled M.A.M.S., and Father's presence created a "chaotic environment" for M.A.M.S. Furthermore, neither parent demonstrated a proper understanding of how their drug use was detrimental to their ability to properly parent M.A.M.S. In fact, both parents denied that the use of methamphetamine interfered with their ability to parent M.A.M.S., and both Mother and Father expressed a jaded belief that if M.A.M.S. was returned to them, their struggles with drug abuse would vanish—a position that defies reality in that what prompted CPS to remove M.A.M.S. from their care was M.A.M.S.'s having tested positive for methamphetamine immediately after birth.

As to the programs available to assist Mother and Father to promote the best interest of M.A.M.S., both Mother and Father demonstrated a lack of commitment to CPS's service plans. Indeed, both Mother and Father refused multiple drug tests, and they also tested positive for methamphetamine during their sparse involvement in CPS's service plans. Additionally, both Mother and Father demonstrated growing agitation toward counseling, and both Mother and Father failed to learn from parenting classes.

As to Mother's and Father's plans for M.A.M.S., neither Mother nor Father offered any evidence of plans that they have to ensure M.A.M.S.'s proper development and growth. On the other hand, CPS recommended, and the trial court found, that M.A.M.S.'s placement with Mother's nephew and wife would be beneficial to M.A.M.S. because the nephew and wife had demonstrated proper

16

parenting toward her in a supervised environment, including an appreciation of M.A.M.S.'s special needs relating to her delays in development, and a desire to adopt M.A.M.S. Furthermore, CPS conducted a home study of the nephew and wife and found their home to be a stable and proper environment for M.A.M.S.

Finally, both Mother's and Father's acts and omissions demonstrate that the existing parent-child relationship is not a proper one. Mother gave birth to M.A.M.S. into the toilet while she was under the influence of methamphetamine, and she was unaware that she was even in labor. Father did not go to the hospital nor contact CPS's social worker for more than six weeks. After CPS provided Mother and Father with service plans, which included drug counseling, Mother and Father continued to use methamphetamine. Mother's use of methamphetamine is particularly dangerous given her propensity for hallucinations and paranoia, and Father demonstrated a complete lack of proper parent-child relationship by showing up to counseling under the influence of methamphetamine. Also, both parents demonstrated neglect toward M.A.M.S. while participating in supervised visits, and Mother threatened multiple CPS workers, including following one of them dangerously close in her vehicle despite M.A.M.S. being in the worker's car.

After weighing the evidence as it relates to the *Holley* factors, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mother's and Father's parental rights to M.A.M.S. is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *see also*

17

*Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *In re A.C.*, 394 S.W.3d 633, 641 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that mother's pattern of illegal drug use, both during pregnancy and after undergoing treatment, supported trial court's best interest finding because it is indicative that mother was not willing and able to provide child with safe environment, resulting in physical danger to child, and tended to indicate improper parent-child relationship) *see also In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *9–10 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (holding that legally and factually sufficient evidence existed to support trial court's finding that termination of mother's parental rights was in her children's best interest when, although mother and her children loved each other and had a strong bond, mother continually misused prescription drugs, failed to demonstrate adequate parental abilities, and failed to utilize various programs provided by CPS). We overrule both Mother's and Father's sole issues on appeal.

## IV. CONCLUSION

Having overruled both of Mother's and Father's sole issues on appeal, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

DELIVERED:  October 17, 2013